**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| IN RE FORTERRA, INC. SECURITIES LITIGATION | Case No.: 3:18-cv-01957-K<br><br><u>CLASS ACTION</u> |

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**
**<u>FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS</u>**

Lead Plaintiff Wladislaw Maciuga ("Maciuga") and additional plaintiff Supanin Disayawathana ("Disayawathana") (collectively, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by and through their attorneys, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys. Such investigation included, among other things, a review of Defendants' public statements and announcements, U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Forterra, Inc. ("Forterra" or the "Company"), securities analysts' reports, news stories, witness interviews, and the review of other publicly-available information. Plaintiffs believe that additional substantial evidentiary support exists for the allegations set forth herein and will be available after a reasonable opportunity for discovery.

## I. OVERVIEW OF THE ACTION

1. This is a securities class action on behalf of all persons and/or entities that purchased Forterra common stock pursuant to and/or traceable to its initial public offering of

common stock, which closed on October 25, 2016 (the "IPO"), seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act").

2. Defendant Forterra is a leading manufacturer of water and drainage pipe and storm water filtration products, as well as architectural, structural, and specialty precast products. The Company is the result of several companies quickly cobbled together by defendant Lone Star, a private equity firm. Lone Star acquired Forterra in April 2015 through a highly-leveraged buyout and then proceeded to cause the Company to complete at least six significant acquisitions for more than $1 billion. These transactions saddled Forterra with approximately $1.2 billion of long-term debt—more than triple the amount it had carried when Lone Star acquired it. And then, a mere 18 months after having acquired Forterra, Lone Star sold off nearly 30% of its stake in the IPO for net proceeds of over $300 million.

3. As one former Forterra accounting manager explained, discussions of an IPO began shortly after Lone Star acquired the Company, and Lone Star installed new management that was more interested in taking the Company public than running the business. Lone Star's treatment of Forterra was similar to someone flipping a house for a quick profit. But, as alleged herein, this house had serious undisclosed defects.

4. As discussed more fully below and based upon the accounts of former Company employees, the prospectus and registration statement issued in connection with the Company's IPO (together, the "Registration Statement") were negligently prepared and, as a result, contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make adequate disclosures required under the rules and regulations governing the preparation of such documents.

5. Defendants failed to disclose in the IPO Registration Statement the existence of certain improper accounting practices and material weaknesses in Forterra's internal controls over financial reporting, which included that: (1) the Company was then engaging in a material amount of bill-and-hold transactions; (2) the Company had failed to implement effective internal controls to ensure that such highly-dubious transactions were being properly accounted; (3) the Company's senior management, in an effort to cut expenses, had stripped its accounting department of much-needed personnel; (4) the Company had failed to implement effective internal controls to ensure that its costs were being properly and accurately accrued; (5) as a consequence, Forterra's 2016 financial statements misstated its costs and profits; and (6) the Company was making inventory accounting entries without adequate substantiation and was making adjustments to its inventory accounting entries without any documentation or reconciliation.

6. Additionally, Forterra's IPO Registration Statement was materially false and misleading because it touted the Company's ability to generate organic growth through cross-selling initiatives amongst its various businesses while failing to disclose that: (1) Forterra had failed to adequately integrate its many new acquisitions for purposes of business development; (2) the Company had not even started rolling out its cross-selling initiative, and would not do so until nearly one year after the IPO; and (3) the Company's businesses were submitting competing bids against one another.

7. Finally, Forterra's IPO Registration Statement failed to comply with applicable federal regulations because Defendants failed to disclose then-existing risks, uncertainties, and trends at the Company.

8. As the truth regarding the foregoing issues was revealed, the trading price of Forterra's stock declined substantially. On the date of the commencement of this action, the Company's stock price closed at $4.44 per share, more than 75% below the IPO price of $18.00 per share. For these reasons, and for those alleged more fully below, Plaintiffs and the other members of the Class have suffered damages as a result of Defendants' actions and omissions.

## II. JURISDICTION AND VENUE

9. The claims asserted herein arise under §§ 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k and 77o. This Court has jurisdiction over the subject matter of this action pursuant to § 22 of the Securities Act, 15 U.S.C. § 77v.

10. Venue is also proper in this District under § 22 of the Securities Act, 15 U.S.C. § 77v(a), which provides that any suit under the Securities Act may be brought "in the district wherein the defendant is found or is an inhabitant or transacts business[.]" Many of the violations of law alleged herein occurred in this District, including the dissemination of the materially false and misleading statements complained of herein. Additionally, each of the other Defendants also has sufficient contacts with this District, or otherwise purposefully availed himself or itself of benefits of this District, so as to render the exercise of jurisdiction over each by this District consistent with traditional notions of fair play and substantial justice.

## III. PARTIES

11. Lead Plaintiff Maciuga purchased Forterra common stock pursuant and/or traceable to the Company's IPO and was damaged thereby. His previously filed certification pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") is attached hereto as Exhibit A.

12. Additional Plaintiff Disayawathana also purchased Forterra common stock pursuant and/or traceable to the Company's IPO and was damaged thereby. His previously filed PSLRA certification is attached hereto as Exhibit B.

13. Defendant Forterra is a manufacturer of pipe and various precast products for a range of water-related infrastructure applications, including water transmission, distribution, and drainage. The Company's headquarters are located in Irving, Texas. Following the IPO, Forterra's stock has traded on the NASDAQ under the ticker symbol "FRTA."

14. Defendant Jeffrey Bradley ("Bradley") is, and was at the time of the IPO, the Chief Executive Officer ("CEO") of Forterra and a member of its Board of Directors (the "Board"). He signed or authorized the signing and/or issuance of the Registration Statement in connection with the IPO.

15. Defendant William Matthew Brown ("Brown") was, at the time of the IPO, an Executive Vice President and the Chief Financial Officer ("CFO") of Forterra. He signed or authorized the signing and/or issuance of the Registration Statement in connection with the IPO. In September 2017, Brown resigned as CFO and left the Company.

16. Defendant Lori M. Browne ("Browne") is, and was at the time of the IPO, a Senior Vice President and the General Counsel of Forterra. She signed or authorized the signing and/or issuance of the Registration Statement in connection with the IPO.

17. Defendant Kyle S. Volluz ("Volluz") is, and was at the time of the IPO, a member of the Forterra Board. He signed or authorized the signing and/or issuance of the Registration Statement in connection with the IPO.

18. Defendants Kevin Barner ("Barner"), Robert Corcoran ("Corcoran"), Samuel D. Loughlin ("Loughlin"), Clint McDonnough ("McDonnough"), John McPherson ("McPherson"),

Chris Meyer ("Meyer"), Chadwick Suss ("Suss"), and Grant Wilbeck ("Wilbeck") were all identified as "Director Nominees" in the Registration Statement. They each authorized the issuance of the Registration Statement in connection with the IPO.

19. Defendants Bradley, Brown, Browne, Volluz, Barner, Corcoran, Loughlin, McDonnough, McPherson, Meyer, Suss, and Wilbeck are referred to herein as the "Individual Defendants."

20. The senior management of Forterra, including defendants CEO Bradley and CFO Brown, as executive officers and authorized representatives of the Company, participated in the solicitation and sale of Forterra common stock to investors in the IPO, motivated in part to serve their own financial interests and the interests of the Company. For example, in October 2016, Bradley and Brown presented at IPO road shows conducted with the underwriters in an effort to persuade investors to purchase Forterra common stock in the IPO.

21. Defendants Forterra US Holdings, LLC, Mid Holdings, Concrete Holdings, LSF9 Concrete Ltd., LSF9 Concrete II Ltd., Stardust Holdings, LSF9 Stardust GP, LLC, Lone Star Fund IX (U.S.), L.P., Lone Star Partners IX, L.P., Lone Star Management Co. IX, Ltd., and John P. Grayken are referred to herein as the "Controlling Shareholder Defendants."

22. At the time of the IPO, Forterra was wholly owned by Forterra US Holdings, LLC. Forterra US Holdings, LLC, was then a Delaware limited liability company wholly owned by Mid Holdings (a Jersey limited company), which was, in turn, wholly owned by Concrete Holdings (a Jersey limited company). Concrete Holdings was then wholly owned by LSF9 Concrete Ltd. (a Jersey limited company), which was then wholly owned by LSF9 Concrete II Ltd. (a Jersey limited company). LSF9 Concrete II Ltd. was then wholly owned by Stardust Holdings (a Bermuda limited partnership). Stardust Holdings was then controlled by its general

partner, LSF9 Stardust GP, LLC (a Delaware limited liability company), which was controlled by Lone Star Fund IX (U.S.), L.P. (a Delaware limited partnership). Lone Star Fund IX (U.S.), L.P. was then controlled by its general partner, Lone Star Partners IX, L.P. (a Bermuda exempted limited partnership), which was then controlled by its general partner, Lone Star Management Co. IX, Ltd. (a Bermuda exempted company). Lone Star Management Co. IX, Ltd. was then controlled by its sole owner/shareholder, John P. Grayken.

23. Lone Star Fund IX (U.S.), L.P., along with its affiliates and associates (including Concrete Holdings, Mid Holdings and Forterra US Holdings, LLC), are collectively referred to as "Lone Star." Lone Star is part of a private equity firm that has organized 16 private equity funds structured as closed-end, private-equity limited partnerships. Immediately prior to the IPO, Lone Star owned all of Forterra's outstanding common stock, and it owned approximately 71.1% of the common stock immediately following completion of the IPO (or 66.8% if the underwriters exercise in full their option to purchase additional shares).

24. Defendants Goldman, Sachs & Co. ("Goldman"), Citigroup Global Markets Inc. ("Citigroup"), and Credit Suisse Securities (USA) LLC ("Credit Suisse") are collectively referred to herein as the "Underwriter Defendants." They were the co-lead active book running managers of Forterra's IPO.

25. Underwriter Defendant Goldman agreed to purchase 4,420,800 shares of Forterra common stock in the IPO, exclusive of its option to purchase additional shares.

26. Underwriter Defendant Citigroup agreed to purchase 4,144,500 shares of Forterra common stock in the IPO, exclusive of its option to purchase additional shares.

27. Underwriter Defendant Credit Suisse agreed to purchase 4,144,500 shares of Forterra common stock in the IPO, exclusive of its option to purchase additional shares.

28. The Underwriter Defendants are investment banking houses that specialize, *inter alia*, in underwriting public offerings of securities. They earned more than $18.2 million in fees collectively from underwriting the IPO. The Underwriter Defendants determined that in return for their share of the IPO proceeds, they were willing to market Forterra stock in the IPO. The Underwriter Defendants arranged a roadshow prior to the IPO during which they, along with representatives from Forterra, met with potential investors and presented favorable information about the Company, its operation, and its financial prospects.

29. The Underwriter Defendants also demanded and obtained an agreement from Forterra that the Company would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws.

30. Representatives of the Underwriter Defendants also assisted Forterra and the Individual Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations (the "due diligence investigation"). The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO. During the course of their due diligence investigation, the Underwriter Defendants had continual access to confidential corporate information concerning Forterra's operations and financial prospects.

31. Agents of the Underwriter Defendants met with Forterra's lawyers, management, and top executives between at least July and October of 2016 to decide: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which Forterra stock would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures Forterra would make in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement.

32. Forterra, the Individual Defendants, the Controlling Shareholder Defendants, and the Underwriter Defendants are collectively referred to hereinafter as "Defendants."

## IV. FORMER EMPLOYEE WITNESSES

33. FE1 was an Accounting Manager in Forterra's corporate accounting group from January 2015 through December 2016, located at the corporate headquarters in Irving. During the five years before that, FE1 held various other accounting positions in the corporate accounting group. As Accounting Manager, FE1 reported to Operations Controller Jose Rendon. Rendon reported to Controller John Dodson, who, in turn, reported to defendant CFO Brown.

34. FE2 was a temporary Senior Inventory Accountant for Forterra from October 2016 through May 2017. FE2 reported to Accounting Manager Joel Jackson, who, in turn, reported to Operations Controller Rendon.

35. FE3 was a Business Development Manager, starting at Heidelberg's pressure pipe division in February 2012, then at Forterra when it acquired the division. FE3 left Forterra in June 2017, when the division was sold to Thompson Pipe.

36. FE4 was a Marketing Manager at Forterra's Irving headquarters from June 2015 through May 2017. FE4 reported to Director of Marketing Heather Meiner until December 2016, and thereafter to Senior Vice President Mark Carpenter.

37. FE5 was a Customer Manager at Forterra's Waco plant from November 2016 through August 2017. FE5's position was the same as that of a Project Coordinator.

38. FE6 was a Sales Administrator at Forterra's Grand Prairie, Texas, plant for 19 years until the pressure pipe division was sold to Thompson Pipe.

## V. SUBSTANTIVE ALLEGATIONS

### A. Forterra's Business and History

39. Forterra is comprised of a number of manufacturing businesses focused on water and drainage pipe, storm water filtration products, precast concrete, and other products primarily used in water infrastructure applications. Forterra operates 96 manufacturing facilities throughout the United States and Eastern Canada, and serves both residential and nonresidential markets.

40. Currently, Forterra has two reporting segments—Drainage Pipe and Water Pipe—with each responsible for approximately half of Forterra's revenues. Drainage is driven by wastewater and storm water infrastructure, highway infrastructure construction, and residential housing starts. Water Pipe sales are driven by residential housing starts and by public spending on water infrastructure. By end market, Forterra generates the largest portion of revenue from U.S. residential markets (35%), followed by U.S. infrastructure (30%) and U.S. commercial (23%). Approximately 9% of revenues are generated outside of the U.S. (largely in Canada).

41. Forterra's original pre-IPO predecessor was Hanson Building Products, which was a Texas-based, building materials manufacturing company. In March of 2015, Defendant Lone Star Fund IX purchased Hanson Building Products from HeidelbergCement AG ("HeidelbergCement") for $1.4 billion in a highly-leveraged buyout. HeidelbergCement had attempted an IPO to raise capital for paying down the Company's already high debt load, but the effort was unsuccessful.

42. Following Lone Star's acquisition of the Company, the acquired businesses that now comprise Forterra were operated by LSF9 Concrete Holdings Ltd. ("Concrete Holdings") as a wholly-owned subsidiary of Lone Star. In February 2016, Lone Star changed Concrete

Holdings' name to Forterra. At that time, in addition to water and drainage, Forterra's operations included a brick segment and a building-products segment. Forterra also had operations in the UK (in addition to the U.S. and Eastern Canada).

43. Prior to taking Forterra public in the IPO, Defendants took several actions to redistribute and/or reorganize Forterra's operations, ultimately resulting in Forterra's current makeup. First, Concrete Holdings distributed the Company's then-existing brick operations to an affiliate of Lone Star (the "Brick Disposition"). Following the disposition of the brick operations (but still prior to the IPO), Concrete Holdings' building products operations in the U.S. and Eastern Canada were transferred to Forterra in an internal reorganization under common control transaction.

44. In April of 2016, Lone Star took the former combined company's UK operations public as a separate company—Forterra UK—in which Lone Star retains majority ownership. Aside from Lone Star's majority ownership of both companies, Forterra UK has no relation with Forterra.

45. Before the IPO, Lone Star caused Forterra to make a series of acquisitions. Between April 2015 and October 2016, the Company spent more than $1 billion to acquire various water and drainage companies, including:

a. $775 million to acquire USP Holdings, Inc. (or "U.S. Pipe");

b. $245 million to acquire Cretex Concrete Products, Inc.;

c. $67 Million to acquire Sherman-Dixie Concrete Industries, Inc.;

d. $30 million to acquire Bio Clean Environmental Services, Inc. and Modular Wetland Systems, Inc.;

e. $32 million to acquire J&G Concrete Operations LLC; and

f. $97.1 million to acquire Precast Concepts LLC.

46. Having already acquired Forterra through a highly-leveraged buyout, Lone Star loaded the Company with even more debt to accomplish these acquisitions. As of June 2016, Forterra had approximately $1.2 billion of long-term debt—more than triple the amount it had carried when Lone Star acquired it. This debt made the Company far more highly leveraged than any of its competitors.

**B. Forterra's IPO**

47. FE1 explained that discussions of an IPO began at Forterra shortly after defendant Lone Star, a private equity firm, acquired the Company. According to FE1, Lone Star installed new management at Forterra that was more interested in taking the Company public than running the business. Indeed, Lone Star completed the IPO a mere 18 months after acquiring the Company from Heidelberg Cement in April 2015.

48. On or about July 8, 2016, Forterra filed with the SEC its registration statement on Form S-1, which would later be utilized in the IPO following multiple amendments on Form S-1/A, the last of which was filed on October 17, 2016 and declared effective by the SEC on October 19, 2017 (the Form S-1, together with all amendments, is referred to herein as the "Registration Statement").

49. On October 19, 2016, Defendants priced the IPO at $18.00 per share. Then, on or about October 21, 2016, Forterra filed the final prospectus for the IPO ("Prospectus"), which forms part of the registration statement (the Prospectus and registration statement are collectively referred to herein as the "Registration Statement"). On October 20, 2016, Forterra stock began trading on the NASDAQ under the ticker symbol "FRTA."

50. On October 25, 2016, the Company completed the IPO, in which it offered 18,420,000 shares of common stock at a public offering price of $18.00 per share. The Company received net proceeds from the IPO of $313.3 million, net of underwriting discounts and commissions and before deducting offering expenses.

**C. Forterra's Undisclosed Improper Accounting Practices and Material Weaknesses in Its Internal Controls Over Financial Reporting**

51. FE1 stated that defendant CFO Brown, Controller Dodson, and Operations Controller Rendon were all members of the new management installed by Lone Star. When they arrived, they began slashing personnel in Forterra's accounting department to cut expenses. This process occurred at a time when Forterra was completing major acquisitions that had to be integrated into its accounting system.

52. For example, when new management arrived in the middle of 2015, eight or nine accountants reported to FE1. FE1's team was responsible for, among other things, cost and revenue accounting, and many of these accountants were very experienced. Over FE1's objections, however, new management proceeded to terminate almost every one of FE1's direct reports. The last of these accountants was terminated around the time of the October 2016 IPO. Although new management represented to FE1 that these accountants would be replaced, FE1 subsequently learned that no effort was being made to replace them. This realization led FE1 to give notice and leave Forterra.

53. By the time that FE1 left Forterra, there was ***one*** remaining accountant helping FE1 with month-end closes and with cost and revenue accounting. To compensate for inadequate staffing, FE1 and his miniscule team regularly worked 70 to 90 hours per week.

54. FE1 also explained that Forterra had a continuing cost accrual issue; costs were not being recognized in the quarters in which they were incurred. According to FE1, Forterra's

system for recording costs was deficient because costs were often recorded manually after the invoices were received, which often occurred after the quarter in which the service or good was provided. This practice rendered the Company's cost accounting inaccurate.

55. At the time of the IPO, Defendants failed to inform investors of Forterra's cost accrual problem. Nor did Defendants inform investors that the Company had cut its accounting personnel to dangerously low levels, leaving a skeleton crew to deal with the cost accrual problem.

56. Seven months after the IPO, on May 15, 2017, Forterra first informed its investors (in its Form 10-Q for the first quarter of 2017) that it had a "material weakness related to the design and operating effectiveness of controls related to the accounting for cost accruals, including control deficiencies related to the Company's lack of timely identification and processing of invoices during the financial statement close process to ensure cost accruals are complete." This material weakness caused Forterra to understate its pretax loss in 2016 by $4.6 million. Specifically, the Company reported that:

> In the current quarter, the Company identified and corrected prior period errors related to cost accrual items which should have been recognized in 2016. These errors were primarily caused by insufficient coordination and communication between the Company's plant and corporate office locations. A cumulative correction was recorded during the quarter ended March 31, 2017 which increased pretax loss by $4.6 million, of which $3.3 million increased cost of revenues and $2.0 million increased selling, general and administrative expenses, partially offset by a $0.7 million increase in revenues.

57. Moreover, FE1 confirmed that at the time of its IPO, Forterra was engaging in material "bill-and-hold" transactions within its pressure pipe and pre-cast pipe divisions. These divisions together accounted for almost $300 million in annual revenue during FE1's tenure. FE6, who was responsible for invoicing for the pressure pipe plants located in Texas, also confirmed that Forterra engaged in bill-and-hold transactions.

58. A bill-and-hold is a form of sales arrangement in which a seller of a good bills a customer for product but does not ship the product until a later date. The accounting community approaches such transactions with heightened skepticism because they present a significant risk of accounting manipulation. For example, a company may employ bill-and-hold transactions to facilitate channel stuffing—*i.e.*, selling product to customers that do not need it for purposes of artificially boosting sales.

59. For this reason, "[a]uditors must be unusually skeptical before accepting such revenue as legitimate. Assuming that bill-and-hold goods are material, the description and quantity of goods should be confirmed directly with the customer. In addition, the auditor should ask the customer to explain the business purpose behind the delayed shipment." Jimmy W. Martin, "Auditor Skepticism and Revenue Transactions," The CPA Journal, Aug. 2002. The Financial Accounting Standards Board, in Accounting Standards Codification Topic 606, sets forth several criteria that must be satisfied before recognizing revenue on a bill-and-hold transaction.

60. At the time of the IPO, Defendants did not inform investors that Forterra had been engaging in highly-dubious bill-and-hold transactions. Five months after the IPO, on March 31, 2017, Forterra finally revealed to its investors (in its Form 10-K for fiscal year 2016) that it had a "material weakness with respect to bill and hold transactions" in connection with the 2016 year-end audit. Specifically, the Company reported that, as of December 31, 2016, it had a material weakness "related to control deficiencies relating to bill and hold revenue transactions, including control deficiencies related to procedures to identify all bill and hold arrangements and sufficiently evaluate the accounting criteria prior to revenue recognition."

61. Also in its 2016 Form 10-K, Forterra announced that, as a remedial measure, it would implement a policy to prohibit all bill-and-hold transactions.

62. FE2's experience further supports Forterra's deficient accounting practices. During FE2's job interview, Rendon said that FE2 would be developing and implementing inventory processes, managing inventory, training personnel to take inventory, and input inventory transactions into Forterra's accounting system. Instead, FE2's job consisted almost entirely of making inventory journal entries and adjustments without any supporting documentation or any insight into how the physical inventory was conducted.

63. At each month-end, FE2 was provided the inventory count from each Forterra plant. FE2 entered these figures and then rolled them into one inventory number for the journal entry. FE2 objected to this process because FE2 did not receive any documentation to support the figures being entered at the warehouse level—nor did FE2 visit any warehouse to personally observe any of the inventory counts. Indeed, FE2 did not visit any Forterra plant during FE2's eight-month tenure at the Company. FE2 requested to make such visits, but Forterra never gave FE2 clearance to actually go.

64. Sometimes, Rendon instructed FE2 to make an adjustment to the total, rolled-up inventory figure. FE2 objected to this process as well because it was unclear how the adjustment was determined, and the adjustment was not reconciled to the warehouse-level inventory count.

65. FE2 believes that Forterra did not hire FE2 permanently due to the foregoing objections raised with respect to inventory accounting.

66. In Forterra's IPO Registration Statement, investors were informed of a material weakness "related to the cumulative impact of control deficiencies found in our inventory cycle

and the fact that the required standard costing and physical observation audit adjustments to inventory was considered material to our financial statements."

67. This disclosure, however, significantly understated Forterra's problem. Investors were not told, for example, that Forterra was making inventory accounting entries without adequate substantiation and making adjustments to its inventory accounting entries without any documentation or reconciliation.

68. Even nearly one year after the IPO, Forterra still had not remediated the foregoing material weaknesses. In its Form 10-Q for the second quarter of 2017, filed on August 10, 2017, the Company reported that its internal controls over financial accounting still were not effective "because of the unremediated material weaknesses" relating to cost accruals, bill-and-hold transactions, and inventory.

### D. Forterra's Undisclosed Failure to Integrate Its Numerous Acquisitions Towards Generating Organic Growth

69. In the lead up to the IPO, Lone Star caused Forterra to go on an acquisition spree, in which it acquired at least six companies for more than $1 billion. Defendants used these acquisitions as a selling point in the IPO, presenting Forterra as a one-stop shop with deep product offerings and wide geographic reach that would allow the Company to cross-sell its products among its various businesses, leading to substantial organic revenue growth—*i.e.*, growth not merely due to adding the revenues of acquisitions. In reality, however, undisclosed conditions in the Company precluded any such benefit from a highly-costly acquisition binge that left it highly indebted.

70. FE4 was responsible for marketing for all product divisions within Forterra, overseeing communications, advertisements, and promotions. While FE4 was aware of the cross-selling initiative, it had not advanced past the "infancy stage" during FE4's tenure because

Forterra was still determining its strategies. When FE4 left the Company in May 2017, the cross-selling initiative had not even been introduced to the entire sales team. FE5, a Customer Coordinator who left in August 2017, could not recall even hearing of any cross-selling initiative. Thus, at the time of the IPO in October 2016, any benefit from Forterra's cross-selling initiative was, at best, a distant hope, with any material impact on sales likely at least one year away.

71. While Defendants touted Forterra's various acquisitions, including U.S. Pipe, to market the IPO, investors were not apprised of the fact that these acquisitions had not been well integrated and that the Company's businesses were not aligned but actually operated at cross-purposes. For example, as FE3 observed, the pressure-pipe division and U.S. Pipe would submit bids on the same jobs. Instead of collaborating to increase organic growth, Forterra's businesses were competing with one another, driving down each other's bids.

72. Unsurprisingly, Forterra's organic revenue growth did not materialize in the first quarter of 2017. On May 15, 2017, Forterra issued a press release reporting its financial results for the quarter ending March 31, 2017—the first full quarter after the IPO. The release stated that the Company's "net sales increased to $338.3 million, compared to $187.0 million in the prior year quarter"—*i.e.*, net sales growth of $151.3 million. However, the sales growth "attributable to the impact of acquisitions . . . increased sales by $163.0 million." In other words, Forterra had negative organic sales growth in the first quarter of 2017.

73. Neither did Forterra's organic revenue growth materialize in the second quarter of 2017. On August 10, 2017, Forterra issued a press release reporting its financial results for the quarter ending June 30, 2017. The release stated that the Company's net sales "increased to $436.7 million, compared to $381.7 million in the prior year quarter"—*i.e.*, net sales growth of

$55.0 million. However, the sales growth attributable to the impact of acquisitions amounted to $56.1 million. In other words, in the second quarter of 2017, Forterra posted a second consecutive quarter of negative organic sales growth.

**A. Post-IPO Developments**

74. The absence of organic revenue growth and the unremediated material weaknesses in Forterra's internal controls severely undermined management credibility and caused the Company's stock to decline. On August 14, 2017, the day this action was commenced, Forterra's stock price closed at $4.44 per share, more than 75% below the IPO price of $18.00 per share.

75. On May 8, 2017, just one week before Forterra reported its financial results for the first quarter of 2017, the Company announced that on May 3, 2017, its Executive Vice President and Chief Operating Officer, Scott Leonard, had resigned effective May 7, 2017. No explanation was provided for the resignation.

76. On September 7, 2017, Forterra announced that defendant CFO Brown had resigned effective immediately the day before.

## VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS IN FORTERRA'S REGISTRATION STATEMENT AND PROSPECTUS

77. Forterra's IPO Registration Statement was negligently prepared and, as a result, contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make adequate disclosures required under the rules and regulations governing the preparation of such documents.

78. First, in the "Material Weaknesses in Internal Control Over Financial Reporting" section, the Registration Statement mentioned only two material weaknesses:

- Systems, processes and people: this material weakness related to the fact we (i) did not have adequate systems in place for recording transactions,

(ii) did not have well designed processes under which we could complete our financial statement close process and (iii) were heavily dependent on HeidelbergCement's people for support functions.

- *Systems*—The issue regarding our systems related to the fact we did not maintain a general ledger in which transactions were recorded on a basis that is consistent with policies established for purposes of complying with GAAP and consistent with our business practices independent of HeidelbergCement and its affiliates. At various times in 2015 prior to the Acquisition, our accounting records were maintained by affiliates of HeidelbergCement under accounting policies intended to comply with HeidelbergCement's IFRS group reporting requirements or, following the Acquisition, under those same accounting policies under the terms of a Transition Services Agreement with HeidelbergCement. In order to prepare financial statements as a stand-alone company in compliance with GAAP, we were required to record a significant number of manual adjusting entries and other adjustments necessary to adjust the financial statements to an appropriate degree of precision necessary for our stand-alone reporting to be accurate.

- *Processes*—Prior to the Acquisition, we were one member of HeidelbergCement's large multinational group of companies and were therefore not required to produce stand-alone financial reporting. Our routine policies, procedures and practices that existed as of December 31, 2015 were developed to process transactions and produce financial data to meet HeidelbergCement's financial reporting needs under IFRS. Our accounting policies and practices had not been substantially modified and documented since the Acquisition. As such, we had not established well-defined processes under which we could complete our financial statement close process for stand-alone GAAP financial reporting at that time.

- *People (dependence on HeidelbergCement)*—In order to produce financial statements in compliance with GAAP, we relied on the resources of HeidelbergCement and its affiliates following the Acquisition. Among other things, at times in 2015, both prior to the Acquisition and following the Acquisition pursuant to a transition services agreement, we were specifically dependent on HeidelbergCement for the provision of legal services, accounting and finance services, human resources, marketing and contract support,

> customer support, treasury, facility and land management and other corporate and infrastructure services. Additionally, an extensive number of third party service providers were performing routine financial statement close processes, including qualitative activities, for much of 2015. We have largely eliminated our reliance on HeidelbergCement personnel and third-parties; however, the training of personnel hired and establishment of effective policies and procedures will continue to be a significant undertaking.
>
> - Inventory: this material weakness related to the cumulative impact of control deficiencies found in our inventory cycle and the fact that the required standard costing and physical observation audit adjustments to inventory was considered material to our financial statements.

79. The above section about Forterra's material weaknesses in its internal controls contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make adequate disclosures required under the rules and regulations governing the preparation of such documents because it failed to disclose that: (1) Forterra had additional material weaknesses in its internal controls regarding cost accruals and bill-and-hold transactions; (2) in an effort to cut expenses, Forterra had stripped its accounting department of much-needed personnel; and (3) as a consequence, Forterra's 2016 financial statements misstated its costs and profits, ultimately requiring an adjustment of previously reported financial results.

80. Second, in the "Critical Accounting Policies" section, under "Revenue recognition," the Registration Statement represented the following:

> Revenues are recognized by the Company when the risks and rewards associated with the transaction have been transferred to the purchaser, which is demonstrated when all the following conditions are met: evidence of a binding arrangement exists (generally, purchase orders), products have been delivered or services have been rendered, there is no future performance required, fees are fixed or determinable and amounts are collectable under normal payment terms. Sales represent the net amounts charged or chargeable in respect of services rendered and goods supplied, excluding intercompany sales. Sales are recognized net of any discounts given to the customer.

> The Company bills and incurs shipping costs to third parties for the transportation of building products to customers. For the period from March 14, 2015 to December 31, 2015, for the period from January 1, 2015 to March 13, 2015, and for the years ended December 31, 2014 and 2013, the Company recorded freight costs of approximately $59,943, $11,041, $69,862, and $63,301, respectively, on a gross basis within net sales and cost of goods sold in the accompanying combined statements of operations.
>
> The Company's revenues primarily relate to product shipments. For certain engineering and construction contracts and building contracting arrangements, the Company recognizes revenue using the percentage of completion method, based on total contract costs incurred to date compared to total estimated cost at completion for each contract. Changes to total estimated contract cost or losses, if any, are recognized in the period in which they are determined. Pre-contract costs are expensed as incurred. If estimated total costs on a contract indicate a loss, the entire loss is provided for in the financial statements immediately. To the extent the Company has invoiced and collected from its customers more revenue than has been recognized as revenue using the percentage of completion method, the Company records the excess amount invoiced as deferred revenue. For the period from March 14, 2015 to December 31, 2015, for the period from January 1, 2015 to March 13, 2015, and for the years ended December 31, 2014 and 2013, revenue recognized in continuing operations using the percentage of completion method amounted to 5%, 4%, 3% and 4% of total net sales, respectively.

81. The above section about Forterra's revenue recognition accounting contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make adequate disclosures required under the rules and regulations governing the preparation of such documents because it failed to disclose that: (i) Forterra was engaging in a material amount of bill-and-hold transactions, and (ii) the Company failed to implement effective internal controls to ensure that such highly dubious transactions were being properly accounted and reported.

82. Third, also in the "Critical Accounting Policies" section, under "Inventories," the Registration Statement represented the following:

> Inventories are valued at the lower of cost or market. The Company's inventories are valued using the average cost method. Inventories include materials, labor and applicable factory overhead costs. The value of inventory is adjusted for damaged, obsolete, excess and slow-moving inventory. Market value of inventory is estimated considering the impact of market trends, an evaluation of economic

> conditions, and the value of current orders relating to the future sales of each respective component of inventory.

83. The above section about Forterra's inventory accounting contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make adequate disclosures required under the rules and regulations governing the preparation of such documents because it failed to disclose that Forterra was making inventory accounting entries without adequate substantiation and was making adjustments to its inventory accounting entries without any documentation or reconciliation.

84. Fourth, in several places, the Registration Statement touts Forterra's ability to achieve organic growth through, among other things, cross-selling efforts among its various newly acquired businesses.

a. The section titled "Our Company" includes the following: "Our organic growth strategy is focused on leveraging our low-cost operations, high level of customer service and product innovation capabilities, as well as our product breadth and industry-leading scale, to cross-sell our products to existing customers to increase penetration and project wins and to gain market share through new customers."

b. The section titled "Our Competitive Strengths" includes the following: "[O]ur extensive product offering also creates cross-selling opportunities for our segments due to our broad and diversified customer base."

c. The section titled "Our Competitive Strengths" also includes the following:

> Over the last three years, we have acquired three businesses in our Drainage Pipe & Products segment and four businesses in our Water Pipe & Products segment (including three acquisitions by U.S. Pipe). Our acquisition strategy focuses on targets that meet a stringent set of criteria: leading market positions with attractive

> margins, high growth geographies, potential for synergies and consolidation, new products and a focus on people development. Acquisitions enable us to improve our product mix and expand our geographic scope, helping us to win business from new customers, cross-sell additional products to existing customers and optimize pricing through the enhanced value created by our differentiated product offering.

d. The section titled "Our Business Strategy" includes the following: "[W]e target our key customers with a robust cross-selling sales organization, marketing the benefits of ordering from one supplier."

85. The above statements about Forterra's organic growth and cross-selling contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make adequate disclosures required under the rules and regulations governing the preparation of such documents because it failed to disclose that: (i) Forterra had failed to adequately integrate its many new acquisitions for purposes of business development; (ii) the Company had not even started rolling out its cross-selling initiative and would not do so until nearly one year after the IPO; and (iii) the Company's businesses were submitting competing bids against one another.

## VII. DEFENDANTS' DUTY TO DISCLOSE PURSUANT TO ITEMS 303 AND 503 OF SEC REGULATION S-K

86. Under applicable SEC rules and regulations, including Item 303 of SEC Regulation S-K, the IPO Registration Statement was required to disclose known trends, events, or uncertainties that were having or were reasonably likely to have an unfavorable impact on the Company's net sales, revenue, or income from continuing operations. Item 303 imposes an affirmative duty on issuers to disclose "known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in a material way." S.E.C. Release No. 6835, 1989 WL 1092885, at *4; *see also* 17 C.F.R. § 229.303(a)(3). "Disclosure of known trends or uncertainties

that the registrant reasonably expects will have a material impact on net sales, revenues, or income from continuing operations is also required. *Id.*

87. Pursuant to Item 303(a), a registrant thus has an affirmative duty to:

> a. Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which the income was so affected; and
>
> b. Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

17 C.F.R. § 229.303(a)(3)(i)-(ii); *see also* S.E.C. Release No. 6835, 1989 WL 1092885, at *8 (May 18, 1989) ("Other non-recurring items should be discussed as unusual or infrequent events or transactions that materially affected the amount of reported income from continuing operations.") (citation and quotation omitted).

88. Thus, even a one-time event, if "reasonably expect[ed]" to have a material impact of results, must be disclosed. Examples of such required disclosures include: "[a] reduction in the registrant's product prices; erosion in the r[e]gistrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract." S.E.C. Release No. 6835, 1989 WL 1092885, at *4 (May 18, 1989).

89. Accordingly, as the SEC has repeatedly emphasized, the "specific provisions in Item 303 [as set forth above] require disclosure of forward-looking information." *See* Mgmt's Discussion and Analysis of Fin. Condition and Results of Operation, S.E.C. Release No. 6835, 1989 WL 1092885, at *3 (May 18, 1989). Indeed, the SEC has stated that disclosure requirements under Item 303 are "intended to give the investor an opportunity to look at the

company through the eyes of management by providing both a short and long-term analysis of the business of the company" and "a historical and prospective analysis of the registrant's financial condition . . . with particular emphasis on the registrant's prospects for the future." *Id.* at *3, *17. Thus, "material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects." *See Comm'n Guidance Regarding Mgmt's Discussion and Analysis of Fin. Condition and Results of Operations*, S.E.C. Release No. 8350, 2003 WL 22996757, at *11 (December 19, 2003).

90. The Registration Statement was also required to disclose certain risk factors under SEC Regulation S-K, Item 503. Item 503 is intended "to provide investors with a clear and concise summary of the material risks to an investment in the issuer's securities." Sec. Offering Reform, S.E.C. Release No. 8501, 2004 WL 2610458, at *86 (Nov. 3, 2004). Accordingly, Item 503 requires that offering documents "provide under the caption 'Risk Factors' a discussion of the most significant factors that make the offering speculative or risky." 17 CFR § 229.503(c). The discussion of risk factors:

> must be specific to the particular company and its operations, and should explain how the risk affects the company and/or the securities being offered. Generic or boilerplate discussions do not tell the investors how the risks may affect their investment.

Statement of the Comm'n Regarding Disclosure of Year 2000 Issues and Consequences by Pub. Cos., Inv. Advisers, Inv. Cos., & Mun. Sec. Issuers, 1998 WL 425894, at *14 (July 29, 1998).

91. Forterra's IPO Registration Statement violated Items 303 and 503 of Regulation S-K because it failed to disclose the existing risks, uncertainties, and/or trends alleged in Section V above.

## VIII. CLASS ACTION ALLEGATIONS

92. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all persons or entities that purchased or otherwise acquired Forterra common stock issued pursuant to and/or traceable to the Company's IPO (the "Class"), and were damaged thereby. Excluded from the Class are each of the Defendants, their respective successors, assigns, parents and subsidiaries, the past and current executive officers and directors of Forterra and the Underwriter Defendants, the legal representatives, heirs, successors or assigns of the Individual Defendants, and any entity in which any of the foregoing excluded persons have or had a majority ownership interest.

93. The members of the Class are so numerous that joinder of all members is impracticable. The precise number of Class members is unknown to Plaintiffs at this time, but it is believed to be in the thousands. Members of the Class may be identified by records maintained by Forterra or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

94. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the Defendants' respective wrongful conduct in violation of the federal laws complained of herein.

95. Plaintiffs have and will continue to fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

96. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether Defendants violated the federal securities laws as alleged herein;

b. whether the Registration Statement issued by Defendants to the investing public omitted and/or misrepresented material facts about Forterra and its business, operations, or prospects; and

c. whether the members of the Class have sustained damages and, if so, the proper measure of damages.

97. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## IX. COUNTS

### COUNT I

### For Violation of Section 11 of the Securities Act Against All Defendants

98. Plaintiffs repeat and reallege each and every allegation contained above. Plaintiffs specifically disclaim any allegations that are based upon fraud, recklessness, or intentional misconduct.

99. This Count is brought by Plaintiffs against all Defendants pursuant to § 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class. The Defendants named in this Count were responsible for the contents and dissemination of the Registration Statement; signed the

Registration Statement; and/or were directors, underwriters or selling stockholders who are appropriate defendants in this Count.

100. This claim is brought by Plaintiffs on their own behalf and on behalf of other members of the Class who purchased or otherwise acquired Forterra common stock pursuant to and/or traceable to the Company's IPO. Each Class member acquired his, her, or its shares pursuant to and/or traceable to, and in reliance on, the Registration Statement. Forterra is the issuer of the common stock through the Registration Statement. The Individual Defendants are signatories to the Registration Statement.

101. The Underwriter Defendants owed to the holders of shares obtained through the Registration Statement the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading. Defendants knew, or in the exercise of reasonable care should have known, of the material misstatements and omissions contained in or omitted from the Registration Statement as set forth herein. As such, Defendants are liable to the Class.

102. Defendants owed to the purchasers of the shares obtained through the Registration Statement the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

103. None of the Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true or

that there was no omission of material facts necessary to make the statements made therein not misleading.

104. Defendants issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements and/or omissions to the investing public that were contained in the Registration Statement, which misrepresented or failed to disclose, among other things, the facts set forth above. By reason of the conduct alleged herein, Defendants violated and/or controlled a person who violated Section 11 of the Securities Act.

105. At the times they obtained their shares of Forterra, Plaintiffs and members of the Class did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

106. By reason of the foregoing, Plaintiffs and the other members of the Class are entitled to damages under § 11 as measured by the provisions of the § 11(e), from the Defendants and each of them, jointly and severally.

**COUNT II**

**For Violation of Section 15 of the Securities Act Against the Individual Defendants and the Controlling Shareholder Defendants**

107. Plaintiffs repeat and reallege each and every allegation contained above. Plaintiffs specifically disclaim any allegations that are based upon fraud, recklessness, or intentional misconduct.

108. This Count is brought by Plaintiffs against the Individual Defendants and the Controlling Shareholder Defendants pursuant to § 15 of the Securities Act, 15 U.S.C. §77o, on behalf of the Class.

109. This claim is asserted against the Individual Defendants and the Controlling Shareholder Defendants, each of whom was a control person of Forterra during the relevant time period. The Individual Defendants and Controlling Shareholder Defendants were control persons of Forterra by virtue of their positions as directors and/or senior officers of the Company, as well as their status as stockholders and their ability to cause the Company to arrange and execute the IPO and disseminate the Registration Statement in connection therewith.

110. The Individual Defendants and the Controlling Shareholder Defendants were in positions to control, and did control, the false and misleading statements and omissions contained in the Registration Statement.

111. None of the Individual Defendants or the Controlling Shareholder Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were accurate and complete in all material respects. Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

112. Plaintiffs and the Class have sustained damages. The value of Forterra common stock has declined substantially due to the Securities Act violations alleged herein.

113. By reason of the above conduct, for which Forterra is primarily liable, as set forth above, the Individual Defendants and the Controlling Shareholder Defendants are jointly and severally liable with and to the same extent as Forterra pursuant to Section 15 of the Securities Act.

## X. PRAYER FOR RELIEF

114. Plaintiffs demand judgment against defendants as follows:

a. determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiffs as class representatives and certifying lead counsel as class counsel;

b. requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

c. awarding Plaintiffs and the Class prejudgment and post-judgment interest, as well as their reasonable counsel fees and expert fees, and other costs and expenses reasonably incurred in this action; and

d. awarding such other relief as the Court may deem just and proper.

## II. JURY TRIAL DEMANDED

115. Plaintiffs hereby demand a trial by jury.

DATED: November 30, 2018

KENDALL LAW GROUP, PLLC

By: */s/Joe Kendall*

Joe Kendall
Texas Bar No. 11260700
jkendall@kendalllawgroup.com
Jamie J. McKey
Texas Bar No. 24025262
jmckey@kendalllawgroup.com
3811 Turtle Creek Blvd., Suite 1450
Dallas, Texas 75219
Telephone: (214) 744-3000
Facsimile: (214) 744-3015

*Liaison Counsel for Lead Plaintiff and the Class*

Joshua L. Crowell
jcrowell@glancylaw.com
Ex Kano S. Sams II
esams@glancylaw.com
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Lead Counsel for Lead Plaintiff and the Class*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served on all counsel of record on November 30, 2018 via CM/ECF, in accordance with the Federal Rules of Civil Procedure.

/s/ *Joe Kendall*
JOE KENDALL